James E. Magleby (7247)
 magleby@mcg.law
Yevgen Kovalov (16297)
 kovalov@mcg.law
**MAGLEBY CATAXINOS &
GREENWOOD, PC**
141 W. Pierpont Avenue
Salt Lake City, Utah 84101-3605
Telephone: 801.359.9000

Scott A. Kitner (*pro hac vice
forthcoming*)
 scott@kitnerwoodward.com
Martin D. Woodward (*pro hac vice
forthcoming*)
 martin@kitnerwoodward.com
**KITNER WOODWARD PLLC**
13101 Preston Road, Suite 110
Dallas, Texas 75240
Telephone: 214.443.4300

Christopher A. Seeger (*pro hac
vice forthcoming*)
 cseeger@seegerweiss.com
**SEEGER WEISS LLP**
55 Challenger Road, 6ᵗʰ Floor
Ridgefield Park, New Jersey
07660
Telephone: 973.639.9100

Scott A. George (*pro hac vice
forthcoming*)
 sgeorge@seegerweiss.com
Frazar W. Thomas (*pro hac
vice forthcoming*)
 fthomas@seegerweiss.com
**SEEGER WEISS LLP**
325 Chestnut Street, Suite 917
Philadelphia, Pennsylvania
19106
Telephone: 215.564.2300

Attorneys for Plaintiffs and the Class

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| **DANIEL CHAPPELL, MASEN CHRISTENSEN, AND JOHN OAKS, individually and on behalf of all others similarly situated,**<br><br>      **Plaintiffs,**<br><br>**v.**<br><br>**CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS AND ENSIGN PEAK ADVISORS, INC.**<br><br>      **Defendants.** | **PROPOSED CLASS ACTION COMPLAINT**<br><br>**JURY DEMANDED**<br><br><br><br><br><br>**Case No.:  2:23-cv-794**<br><br>**Honorable** |

Plaintiffs Daniel Chappell, Masen Christensen, and John Oaks bring this action for themselves and all others similarly situated against Defendant Corporation of the President of the Church of Jesus Christ of Latter-day Saints ("COP") and Ensign Peak Advisors, Inc. ("Ensign") (collectively "Defendants"). Upon personal knowledge of the facts pertaining to Plaintiffs and on information and belief as to all other matters, and upon the investigation conducted by Plaintiffs' counsel, Plaintiffs allege as follows:

**<u>Preliminary Statement</u>**

1.      For decades, COP has used false pretenses to obtain donations. Rather than use these funds entrusted to it for charitable work, COP secreted donations away in Ensign in order to avoid public scrutiny and accountability to the donors, and instead used them for purposes never contemplated by donors and contrary to representations by COP.

2.      A primary source of donated funds obtained by COP are tithes, which are traditionally 10% of any income or profits earned each year by members for the "missions" of COP.  In addition to the regular tithes, COP also solicits independent donations from members and nonmembers alike to fund specific charitable work.

3.      For instance, COP maintains various philanthropies, including "Humanitarian Relief," which provides "immediate emergency assistance to victims" of disasters.  On its website, COP solicits donations to the Humanitarian Relief fund by

stating that "One hundred percent of every dollar donated is used to help those in need without regard to race, religion, or ethnic origin."[1]



4.      Despite these representations to donors, Plaintiffs understand based on public reports from third parties that COP deliberately hid that some, if not all, of these donations (including both tithes and donations made to a COP philanthropy) are permanently invested in accounts it never uses for any charitable work, so that every year, an enormous portion of the donations are never spent for these—or any—purposes.

5.      COP went to extreme lengths to conceal from the public and its members the actual disposition of donations.  It created a special non-profit entity, Ensign, to hold and invest the donations. COP had Ensign egregiously understate the value of its holdings in public filings with the Internal Revenue Service and the Securities and Exchange Commission. This allowed COP to ensure the nature and extent of its assets remained hidden.

---

[1] *See* https://philanthropies.churchofjesuschrist.org/humanitarian-services/funds/humanitarian-general-fund/; https://philanthropies.churchofjesuschrist.org/humanitarian-services/funds/emergency-response/

6.      In December 2019, a whistleblower with exclusive knowledge of the finances of Defendants divulged that over the past two decades, COP has funneled billions of dollars of donations into covert permanent investments through Ensign.

7.      In response, COP continued its efforts to conceal its practices, including issuing a statement that it "complies with all applicable law governing our donations, investments, taxes and reserves."[2]

8.      In February 2023, the Security and Exchange Commission ("SEC") brought charges against Ensign and COP related to their evasion of public reporting requirements through the use of shell corporations "to avoid negative consequences in light of the size of The Church's portfolio."[3]  As part of a negotiated settlement with the SEC, COP and Ensign agreed to pay a total of $5 million in civil penalties to settle the charges.

9.      Because Defendants engaged in a scheme to solicit funds from donors for specific purposes, but actually used those funds for different purposes, and hid their actual use of funds from donors, Plaintiffs are entitled to money damages and injunctive relief under Utah law.

10.      Plaintiffs, on behalf of a Class of other people who made donations to COP and its charitable arms, now ask the Court to determine that COP has breached the fiduciary and other duties it owed donors in its solicitation, collection, use, and

---

[2] https://newsroom.churchofjesuschrist.org/article/first-presidency-statement-church-finances

[3] *See* Order Instituting Cease-And-Desist Proceedings Pursuant to Section 21C of the Securities and Exchange Act of 1934, Making Findings, and Imposing a Cease-And-Desist Order. https://www.sec.gov/files/litigation/admin/2023/34-96951.pdf

disposition of these charitable donations. Defendants continued to misrepresent their use of funds, including concealing their illegal scheme to hide their assets using shell companies, even after the whistleblower first came forward in 2019.

**Jurisdiction and Venue**

11.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332(d) because the Class consists of more than 100 members, the amount in controversy exceeds the sum or value of five million dollars exclusive of recoverable interest and costs, and minimal diversity exists.

12.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendants are residents of this District, are incorporated in this District, and maintain principal places of business in this district, and because a substantial part of the events and omissions giving rise to the claims of Plaintiffs and the Class occurred in this District.

**Parties**

13.     Defendant COP is a Utah corporation with its principal place of business at 50 East North Temple, Salt Lake City, Utah 84150. It may be served with process through its registered agent, Corporate Agent Services, LLC, at 36 S. State Street, Suite 1900, Salt Lake City, Utah 84111.  The COP is the legal entity behind the Church of Jesus Christ of Latter-day Saints (the "Church").

14.     COP is the apex organization among the various entities that together operate non-religious businesses and investments on behalf of the Church. COP is the owner, operator, and overseer of a significant number of for-profit and non-profit

entities, including dozens of office and apartment buildings, four universities, and three media companies.[4]  The Church has nearly seven million members in the United States.

15.     COP (including its employees, subsidiaries, affiliates, volunteers, and agents) promoted, advertised, provided instructions for, administered, oversaw, and collected donor funds from donors throughout Utah and the United States.[5]

16.     Defendant Ensign Peak Advisors, Inc.  ("Ensign" or "Ensign Peak Advisors") is registered as a Utah nonprofit corporation with its principal place of business at 60 East South Temple St., Suite 400, Salt Lake City, Utah 84111. It may be served with process through its registered agent, Corporate Agent Services, LLC, at 36 S. State Street, Suite 1900, Salt Lake City, Utah 84111.

17.     Ensign is governed by a board of trustees that is made up of members of COP's presiding bishops, and a managing director appointed by the President of COP. The managing director of Ensign reports to senior leadership of COP.

18.     Ensign is the entity responsible for managing the donations at issue in this case.

19.     Plaintiff Daniel Chappell is a resident of Virginia.

20.     Between January 1, 2013 and today, Mr. Chappell donated approximately $108,000 to COP.

21.     Plaintiff Masen Christensen is a resident of Utah.

---

[4] Lars Nielsen, "Letter to an IRS Director," https://www.scribd.com/document/439385879/Letter-to-an-IRS-Director, at 5 & nn. 5-9.  For ease of reference, this document will be referred to as "Whistleblower report," even though its author is not the actual whistleblower.

[5] All allegations regarding COP's conduct include the conduct of COP's employees, subsidiaries, affiliates, volunteers, and agents.

22.     Between January 1, 2013 and today, Mr. Christensen directly donated approximately $120,000 to COP.

23.     In addition, Mr. Christensen has donated approximately $46,000.00 through donor advised funds.

24.     Mr. Christensen is an active member of the Church who made his most recent annual donation to COP on November 11, 2022 and plans to continue making annual donations for the foreseeable future with the understanding the equitable and injunctive relief sought in this litigation is realized.

25.     Plaintiff John Oaks is a resident of Utah.

26.     Between January 1, 2013 and today, Mr. Oaks donated approximately $74,000 to COP.

27.     Plaintiffs reserve the right to amend this Complaint to name additional party defendants revealed by discovery or further investigation to have been involved with the solicitation, collection, and clandestine investment of donations.

**Any Applicable Statues of Limitations are Tolled**

28.     Plaintiffs and Class members did not discover and could not discover through the exercise of reasonable diligence that Defendants had been engaged in a scheme to defraud Plaintiffs and other donors by soliciting charitable donations using false and misleading representations, actually directing donor funds towards Ensign's investment portfolio, and engaging in a series of sham transactions and securities law violations in order to obscure the true use of the funds from donors and regulatory authorities.

7

29.     Any applicable statutes of limitation have been tolled by the Defendants' knowing, active, and ongoing fraudulent concealment of the facts alleged herein. Defendants knew (or should have known) that while they were soliciting, collecting, and receiving donations that a significant amount would be invested instead of being used for charitable purposes as COP represented to members and the public at large. Defendants suppressed this information and affirmatively misrepresented to Plaintiffs and Class members that they were obeying all applicable laws and that donor funds were not being misdirected from the purpose for which they were solicited. Thus, Defendants actively concealed from, and failed to notify, Plaintiffs, Class members, and the public of the critical material fact that a significant portion of donations made to COP are not applied to the purpose for which they were solicited.

30.     Defendants were under a continuous fiduciary duty to disclose to Plaintiffs and Class members the true character and nature of the disposition of all donated funds collected, including the critical material facts that a significant portion of donated monies are not used for any religious or charitable purpose, but rather are diverted to non-charitable investments. Plaintiffs and Class members reasonably relied on Defendants' affirmative representations regarding their use of donated funds, and their concealment of the truth about how the funds are used, which rendered their statements misleading.

31.     Plaintiffs relied upon and trusted Defendants' representations, and (to the extent relevant) exercised reasonable diligence but were prevented from uncovering the full extent of Defendants' scheme as a result of Defendants' own omissions and direct misrepresentations regarding the underlying facts.

32.     Under these circumstances, the hardship that enforcing any limitations period would impose on the Plaintiffs would outweigh any prejudice to Defendants from difficulties of proof caused by the passage of time.

33.     As a result, enforcing the limitations period here would be irrational and unjust.

34.     Based on the foregoing, Defendants are estopped and otherwise unable to rely upon on any statutes of limitation or other limitations on the timeliness of the claims asserted in defense of this action.

**Factual Allegations**

**A.     Forms of Donation**

35.     COP asks members to tithe.  Members are expected to tithe ten percent (10%) of their income and profits.

36.     COP has publicly, continually, and repeatedly declared in no uncertain terms that tithing funds are "always used" for charitable purposes.

37.     Church members can make tithing donations online through a dedicated website operated by or on behalf of COP.[6] COP also uses "tithing slips" in its solicitation, collection, and recordkeeping. The following are examples of two such slips

---

[6] *See, e.g.,* https://www.churchofjesuschrist.org/help/support/finance/online-donations?lang=eng

used in recent years; the older version is shown on the left, and a revised version COP introduced in 2012 is on the right:[7]



---

[7] https://mormonisminvestigated.files.wordpress.com/2013/06/tithing-slip3.jpg (image on left); https://store.churchofjesuschrist.org/usa/en/tithing-and-other-offerings-form/5639243870.p (image on right).

38.     Referring to its tithing slips, COP explains, "Donors use this form to itemize their offerings when submitting to a bishopric or priesthood member."[8]

39.     Outside of the tithe, COP also directly solicits donations for its charitable arms from the public at large.

40.     The Church of Jesus Christ of Latter-day Saints – Philanthropies ("Philanthropies"), operates as the charitable arm of COP. As the associated website describes, "Philanthropies is the department of COP of Jesus Christ of Latter-day Saints responsible for facilitating philanthropic donations (not tithing or fast offerings) to COP and its affiliated charities."[9]  The organization has existed in some form since 1955. In 2018, its name was changed to "The Church of Jesus Christ of Latter-day Saints – Philanthropies." COP states that donations will be used entirely to help the needy:

**100 percent of all donations** go to help those in need. No administrative costs are deducted by Philanthropies or our affiliated charities.[10]

41.     Philanthropies oversees the administration of donations to various charitable projects, including several Church-affiliated universities and Latter-day Saint Charities, a non-profit corporation also headquartered in Salt Lake City, Utah. Donations solicited by COP, however, are not restricted to the entity for which they were solicited, but are disbursed across a baroque web of subsidiary organizations and holding companies, many of which serve no charitable purpose at all.

---

[8] https://store.churchofjesuschrist.org/usa/en/tithing-and-other-offerings-form/5639243870.p

[9] https://philanthropies.churchofjesuschrist.org/philanthropies/about/

[10] https://philanthropies.churchofjesuschrist.org/philanthropies/about/ (bold in original).

42.     In the portions of its website soliciting donations, COP represents that money donated to humanitarian relief will be spent — "is used"— solely on charitable activities.  The "Humanitarian Aid" portion of its website describes how "100% of every dollar donated is used to help those in need—without regard to race, religion, or ethnic origin."  This same page contains multiple links to "Make a Gift to Humanitarian" by donating money:[11]



## How We Operate

Two ideas are at the core of the Church's efforts to care for those in need:

1. 100% of every dollar donated is used to help those in need—without regard to race, religion, or ethnic origin.
2. The Church's humanitarian efforts help people attain self-sufficiency so they can be self-reliant long after the humanitarian project ends.

43.    A separate page for Philanthropies soliciting donations likewise solicits donations to Humanitarian Aid with the promise that "one hundred percent of every dollar donated is used to help those in need without regard to race, religion, or ethnic origin." Immediately below this promise is another link inviting the reader to "Make a Gift to Humanitarian Aid."[12]

## You Can Help

One hundred percent of every dollar donated is used to help those in need without regard to race, religion, or ethnic origin.

Make a Gift to Humanitarian Aid

44.    Clicking through this link delivers the reader to a giving page of COP. The top of the giving page, which invites the reader to enter the amount of their donation, again suggests that the purpose of the donation is "[t]o relieve suffering, foster self-

---

[12] https://philanthropies.churchofjesuschrist.org/humanitarian-services/funds/humanitarian-general-fund/

reliance and provide opportunities for service. Relief is provided to people around the globe without regard to race, religious affiliation, or nationality."[13]



---

[13] https://donate.churchofjesuschrist.org/donations/church/humanitarian-services/humanitarian-aid-fund.html?cde2=475-Humanitarian-home&cid=Humanitarian-home-donate-button&

45.    COP also solicits donations for its Missionary Fund.  In its solicitation page, COP describes the purpose of these donations as to "provide needed funding so that all who want to serve a full-time mission may do so."[14]



46.    When the reader clicks through the "make a gift" link, they are taken to a payment page.  At the top of the page, near the field for entering the donation amount, the page reads "Funds allow thousands of young men and young women from around the globe to have the opportunity to serve a full-time mission for the Church of Jesus

---

[14] https://philanthropies.churchofjesuschrist.org/missionary

Christ of Latter-Day Saints who otherwise would not have the financial ability to do so."[15]



---

[15] https://donate.churchofjesuschrist.org/donations/church/missionary-fund.html?cde2=807-Missionary-home&cid=Missionary-home-donate-button&

47.     Recently, COP made some changes to its public solicitation, but without any apparent change to the disposition of the collected funds and without providing any more transparency: [16]

# Church History

Thank you for your interest in supporting Church History activities. We are grateful for your continued faithfulness and generosity. The Church has changed its fundraising policies and now accepts donations for three funds:

Humanitarian Aid Fund
General Missionary Fund
Church General Fund

Church History activities and projects, including restoring and maintaining sacred sites, will be addressed through the Church General Fund. This change allows you to contribute funds that will be used to meet ever-changing needs while being guided by prophetic direction. Thank you for continuing to seek and do good.

48.     These representations are consistent with how COP has represented its work, the work of its Philanthropies, and the use to which it would put donated funds for decades.

49.     In a 2005 article in The Church News, an official publication of The Church, COP representatives described why the organization was changing its name from the "LDS Foundation" to "LDS Philanthropies."

---

[16] https://philanthropies.churchofjesuschrist.org/church-history

50.     In the article, representatives from COP explained that donors' "gifts are sacred and they are treated as such."[17]

51.     The article goes on to paraphrase a statement by Richard C. Edgley, the first counselor in the Presiding Bishopric in 2005: "One hundred percent of everything that is contributed through LDS Philanthropies goes to the specific purpose it was contributed for. 'There is zero overhead' taken out of the donation for administrative costs."[18]

52.     As a result, the article continues, "Donations are often accepted from those not of our faith — mostly for The Church's humanitarian efforts."  Edgley attributes this to the fact that "The Church has a reputation of using the funds appropriately and wisely and for purposes that general populations feel good about."

53.     Despite COP's representations to the contrary, a substantial and significant amount of the funds it received are not used for humanitarian aid or any other philanthropic or mission-related purpose. Instead, they are distributed to COP, to Philanthropies, or to the Corporation of the Presiding Bishop.  Once donated, donor funds are shifted throughout various church organizations, including between these three entities, to Ensign, and to Ensign's comingled funds:[19]

---

[17] https://www.thechurchnews.com/2005/9/17/23236006/lds-philanthropies-depicts-organization

[18] *Id.*

[19] Whistleblower report at Exh. H.2.



54. Once funds are transferred to Ensign, they are continually reinvested and never used to fund any Church organizations or efforts.

**B.    The History of Ensign Peak Advisors**

55. In 1997, COP created a non-profit entity called Ensign Peak Advisors, Inc. Ensign's articles of incorporation specify that it "is organized and shall be operated exclusively for religious, educational and charitable purposes, within the meaning of Section 510(c)(3) of the Internal Revenue Code, to benefit, perform the functions of, or carry out the purposes of" COP.[20] They further specify that its "property is irrevocably

---

[20] Whistleblower report at Exh. E.

dedicated to religious, educational and charitable purposes meeting the requirements for exemption provided by Section 501(c)(3) of the Internal Revenue Code."[21]

56.     But—in coordination with COP, and contrary to its only reason for existing—Ensign has never fulfilled its purported mission for COP nor functioned as a charitable entity.[22] Instead, for more than two decades, it has done only one thing: it has invested donations collected by COP, without ever disbursing these funds towards any charitable purpose.[23]

57.     In fact, Ensign has never made a single expenditure for any religious, educational, or charitable objective—and it has no plans to ever spend any of the money it has gathered, instead acting as a massive hedge fund from which no withdrawals are allowed. As the Whistleblower report describes it, Ensign "is the reserve of the reserves" of COP; COP "does not draw down on it, and it has no mission—no liability stream, no schedule of activities, no plans for use, and no efforts to even model the future."[24]

58.     COP deliberately keeps its use of Ensign shrouded in secrecy. "The $100+ billion corporation has remarkably few employees (20 people in 2010, and 75 people in 2019); it doesn't even have a sign on the building or in the lobby downstairs."[25]  Ensign employees are siloed from each other, separated by portfolio

---

[21] Whistleblower report at Exh. E.

[22] *See generally* Whistleblower report; *see also id*. at 6.

[23] *See generally* Whistleblower report; *see also id*. at 6.

[24] Whistleblower report at 6.

[25] Whistleblower report at 21 & n.oo.

team; only four employees (the President, Chief Investment Officer, Chief Financial Officer, and Senior Accountant) are permitted to see Ensign's actual financial statements.[26]

59.     But COP is taking advantage of Ensign's non-profit status to receive billions of dollars in tax breaks on the interest its investments generate, even though Ensign demonstrably does nothing charitable, religious, or educational.[27]

### C.     COP Repeatedly Misrepresents what it Does with the Donations that End Up in Ensign

60.     By December of 2019, Ensign had accumulated more than $120 billion from donations to COP or returns on investments of those donations.[28]  As the Whistleblower report states: "[Ensign] made 0 distributions in the first 12 years of its existence. It has made 0 distributions in the past five years. It did have two outflows in 22 years. Neither was planned, and neither went to the furtherance of Ensign's exempt purpose nor that of its parent[, COP]."[29]

61.     In 2009, Ensign spent $600 million to bail out a failing for-profit life insurance company owned by COP.[30]  And between 2010 and 2014, Ensign made a series of payments—again using donated dollars exclusively—for the construction of the City Creek Mall in Salt Lake City, totaling $1.4 billion.[31]

---

[26] Whistleblower report at 15 & n.cc.

[27] Whistleblower report at 8.

[28] Whistleblower report at 4-8 & Exh. A.

[29] Whistleblower report at 6.

[30] Whistleblower report at 7 & n.f.

[31] Whistleblower report at 7 & n.h.

62.     In the lead-up to the construction of the mall, an article in the December 2006 issue of the COP-owned *Ensign* magazine stated that no tithing funds would be used for mall construction.[32]

63.     An October 5, 2012 article in the Salt Lake Tribune, described Keith McMullin, a high-ranking Church official who was then leading another COP-affiliated company, Deseret Management Corp., as stating that "not one penny of tithing goes to the church's for-profit endeavors," and also reported that "[s]pecifically, the Church has said no tithing went toward City Creek Center."[33]  But by this time, COP had already made payments from tithing dollars toward building the mall.[34]

64.     COP and Ensign have, in coordination, made additional misleading statements in sworn financial reports to the IRS. As a non-profit, Ensign is required only to file an abbreviated financial disclosure using a Form 990 ("990").  On Ensign's 990 for 2007, its President signed under penalty of perjury that the "Book value of all assets at end of year" was "1,000,000" dollars:[35]

---

[32] Whistleblower report at 7-8 & n.h.  *See also Church Releases Plans for Downtown Salt Lake*, Ensign Magazine, Dec. 2006, *available at* https://www.churchofjesuschrist.org/study/ensign/2006/12/news-of-the-church/church-releases-plans-for-downtown-salt-lake?lang=eng ("No tithing funds will be used in the redevelopment").

[33] Whistleblower report at 7-8 & n.h., *see also The Money Behind the Mormon Message*, Salt Lake Tribune, Oct. 05, 2012, *available at* https://archive.sltrib.com/article.php?id=54478720&itype=cmsid ("McMullin said not one penny of tithing goes to the church's for-profit endeavors. Specifically, the church has said no tithing went toward City Creek Center.")

[34] Whistleblower report at 8 & n.h.

[35] Screenshot of "Full video exposé" of "Letter to an IRS Director," https://youtu.be/KDlFZF3RyhE, at 41:00.



65.     In actuality, the book value of Ensign's assets at the time was approximately $38,000,000,000—meaning the declaration made under penalty of perjury reported a figure that was 38,000 times too small.[36]

66.     On Ensign's 990 for 2010, its President signed under penalty of perjury that the "Book value of all assets at end of year" was "over 1,000,000" dollars:[37]

---

[36] *See* Whistleblower report at Exh. K.

[37] Screenshot of "Full video exposé" of "Letter to an IRS Director," https://youtu.be/KDlFZF3RyhE, at 41:00.



67.    In actuality, the book value of Ensign's assets at the time was approximately $40,000,000,000—meaning the declaration made under penalty of perjury reported a figure that was 40,000 times too small (unless the handwritten word "over" was meant to convey to the reader "multiply this number by 40,000 if you would like to know the actual 'Book value of all assets at end of year' to which I am swearing under penalty of perjury.").[38]

68.    Thus, COP not only failed to disclose its large-scale hoarding of donated funds; it also, through and in coordination with Ensign, hid as much information as possible about the purported charitable non-profit whose investing has yielded more

---

[38] *See* Whistleblower report at Exh. K.

capital than some nations—even by making misrepresentations to the IRS to keep the trove a secret.

69.     As part of this effort to conceal the extent of its holdings from regulators and the public, Ensign and COP participated in a scheme to hide the extent of its assets from the public because the "Church was concerned that disclosures of assets in the name of Ensign Peak, a known Church affiliate, would lead to negative consequences in light of the size of the Church's portfolio."[39]

70.     Section 13(f) of the Exchange Act requires institutional investors that control at least $100 million in securities, like Ensign, to publicly file quarterly public disclosures with the SEC listing the full market value of the securities that it manages.

71.     To evade these reporting requirements, COP and Ensign (both based in Utah), launched an increasing number of out-of-state shell corporations with Church employees serving on each as purported "business managers."  By the time the SEC intervened, COP and Ensign had established 13 shell corporations to hide COP's increasing assets.  The full description of COP's illegal scheme to hide its assets from scrutiny by, among others, those who entrusted funds to COP for its mission and charitable work, is set forth in the SEC's Order Instituting Cease-And-Desist Proceedings Pursuant to Section 21C of the Securities and Exchange Act of 1934, Making Findings, and Imposing a Cease-And-Desist Order.[40]

---

[39] *See* Order Instituting Cease-And-Desist Proceedings Pursuant to Section 21C of the Securities and Exchange Act of 1934, Making Findings, and Imposing a Cease-And-Desist Order at ¶ 8. https://www.sec.gov/files/litigation/admin/2023/34-96951.pdf

[40] *See* https://www.sec.gov/files/litigation/admin/2023/34-96951.pdf

72.     Indisputably, by incurring millions in civil fines paid by COP and Ensign for their orchestrated and illegal deception, the COP and Ensign wasted these funds and diverted them away from any potential use for the purported charitable mission of COP and Ensign.

**D.     Plaintiffs donated money to COP because of COP's solicitations and were unaware of the Ensign investments and deceptions.**

73.     Plaintiff Chappell donated approximately $108,000 to the COP over the last ten years.

74.     Based on COP's representations, Plaintiff Chappell reasonably believed that his donations would be used only for charitable purposes.  Because of Defendants' ongoing efforts to conceal from the public the nature and extent of the donations held by Ensign, Plaintiff could not appreciate the true manner in which the COP actually intended to (and did) use his donations.

75.     Plaintiff Christensen donated approximately $166,000 to the COP over the last ten years.

76.     Based on COP's representations, Plaintiff Christensen reasonably believed that his donations would be used only for charitable purposes.  Because of Defendants' ongoing efforts to conceal from the public the nature and extent of the donations held by Ensign, Plaintiff could not appreciate the true manner in which the COP actually intended to (and did) use his donations.

77.     Plaintiff Oaks donated approximately $74,000 to the COP over the last ten years.

78.    Based on COP's representations, Plaintiff Oaks reasonably believed that his donations would be used only for charitable purposes.  Because of Defendants' ongoing efforts to conceal from the public the nature and extent of the donations held by Ensign, Plaintiff could not appreciate the true manner in which the COP actually intended to (and did) use his donations.

79.    Plaintiffs did not believe and had no reason to ever suspect that COP would take any portion of their donations and invest it into Ensign, where it would sit and accumulate interest in perpetuity and otherwise be used in manners antithetical to the purported mission of COP and Ensign. And even if Plaintiffs had any suspicions that COP was engaging in any such practice, they never could have discovered it.

80.    Plaintiffs reasonably relied on COP's public statements, including that the "vast majority" of donated funds were "used immediately" and that COP complied with "all applicable laws."

### Class Allegations

81.    Plaintiffs seek to represent the following Class:

All persons in the United States who donated money to Defendants from January 1, 1998 through the date the Class is certified. Excluded from the Class are all persons who make a timely election to be excluded, governmental entities, and the Judge to whom this case is assigned and his/her immediate family.

82.    Plaintiffs reserve the right to revise the Class definition based upon information learned through discovery.

83.    Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using

the same evidence as would be used to prove those elements in individual actions alleging the same claim.

84.     Certification of Plaintiffs' claims is particularly appropriate as Utah law will apply to the claims of all Class members as the claims are asserted in this Court sitting in Utah.  In addition, Defendants are based in Utah and all representations, omissions, concealments and decisions that provide the basis for the claims asserted in this litigation were conceived of, made, orchestrated and realized in Utah, which has the most significant relationship to the challenged conduct and the parties.

85.     This action has been brought and may be properly maintained on behalf of the Class proposed herein under Federal Rule of Civil Procedure 23.

### A.     Numerosity and Nature of the Notice

86.     Pursuant to Federal Rule of Civil Procedure 23(a)(1), the members of the Class are so numerous and geographically dispersed that individual joinder of all Class members is impracticable. While Plaintiffs are informed and believe that there are millions of members of the Class, the precise number is unknown. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, internet postings, and/or published notice.

### B.     Commonality and Predominance

87.     Pursuant to Federal Rules of Civil Procedure 23(a)(2) and 23(b)(3), this action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

a.   Whether Defendants engaged in the conduct alleged herein, including misrepresentation of the use to which funds it solicited would be used and the actual use to which it put such funds;

b.   Whether the conduct of Defendants violates the law as asserted herein, including breaches of its duties to Plaintiffs and other Class members as donors;

c.   Whether Plaintiffs and the other Class members are entitled to equitable relief, including, but not limited to, restitution or injunctive relief; and

d.   Whether Plaintiffs and the other Class members are entitled to damages and other monetary relief and, if so, in what amount.

### C.   Typicality

88.    Pursuant to Federal Rule of Civil Procedure 23(a)(3), Plaintiffs' claims are typical of the other Class members' claims because, among other things, all Class members were comparably injured through the wrongful conduct of Defendants as described above.

### D.   Adequacy

89.    Pursuant to Federal Rule of Civil Procedure 23(a)(4), Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other members of the Class they seek to represent; Plaintiffs have retained counsel competent and experienced in complex class action litigation; and Plaintiffs intend to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

### E.   Declaratory and Injunctive Relief

90.    Pursuant to Federal Rule of Civil Procedure 23(b)(2), Defendants have acted or refused to act on grounds generally applicable to Plaintiffs and the other

members of the Class, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class as a whole.

### F.      Superiority

91.      Pursuant to Federal Rule of Civil Procedure 23(b)(3), a class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for Class members to individually seek redress for Defendants' wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## <u>CAUSES OF ACTION</u>

### FIRST CAUSE OF ACTION
### Breach of Fiduciary Duty

92.      Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

93.      The Utah Charitable Solicitations Act states: "Every person soliciting, collecting, or expending contributions for charitable purposes, and every officer,

director, trustee, or employee of any person concerned with the solicitation, collection, or expenditure of those contributions, shall be considered to be a fiduciary and acting in a fiduciary capacity."  Utah Code § 13-22-23.

94.     The Act defines "charitable purpose" as "any benevolent, educational, philanthropic, humane, patriotic, religious, eleemosynary, social welfare or advocacy, public health, environmental, conservation, civic, or other charitable objective". Utah Code § 13-22-2(3).

95.     As described in detail in the factual allegations above, COP, including its employees, subsidiaries, affiliates, volunteers, and agents, promoted, advertised, provided instructions for, administered, oversaw, and collected tithing funds from donors throughout Utah and the United States.

96.     At all relevant times, COP was a fiduciary or acting in a fiduciary capacity in connection with its promotion, solicitation, expenditure, and handling of all charitable contributions by Class members. It accordingly owed the members of the Class all applicable fiduciary duties, including the duty to fully disclose to them all material facts and information in connection with its disposition of the donations.

97.     At all relevant times, Ensign was a fiduciary or acting in a fiduciary capacity in connection with its promotion, solicitation, expenditure, and handling of all charitable contributions by Class members. Among other things, it acted as a fiduciary in its capacity as the entity that held such funds, would make expenditure of donated funds, and purportedly used such funds for charitable purposes.  It accordingly owed the members of the Class all applicable fiduciary duties, including the duty to fully

disclose to them all material facts and information in connection with its disposition of the donations.

98.     Further, Ensign aided and abetted in the breach of COP's fiduciary duty to Plaintiffs and the Class by, among other things, concealing the use and disposition of funds it received, establishing shell companies and the use of other deceptions to conceal the full extent of the funds it held, and putting funds to uses other than those for which they were solicited.

99.     Under the circumstances described in detail above, COP and Ensign breached their fiduciary duties to Plaintiffs and the members of the Class by, among other things, misusing the donations, failing to use the donations as represented, failing to fully disclose to the Class all material facts and information in connection with their disposition of donated monies, and by continuing to misrepresent their use of donated funds and criminal activity after their scheme was partially disclosed to the public.

100.    As a direct and proximate result of Defendants' breach of their fiduciary duties, Plaintiff and members of the Class donated money to COP under the reasonable, but mistaken, belief that the funds would be used in the ways that COP represented that they would when it solicited donations.

101.    However, some portion of those donated funds was actually diverted to Ensign, with no intention of ever being used for the solicited purpose at all, let alone "immediately."

102.    As a result of the above, Plaintiffs and Class members suffered damages of an amount to be proven at trial, and are entitled to seek such other relief as may be ordered by the Court.

**SECOND CAUSE OF ACTION**
**Fraud and Fraudulent Inducement**

103.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

104.    In the course of soliciting donations from Plaintiffs and the Class, Defendant COP made false representations regarding contemporaneously existing material facts and made promises of future performance with no contemporaneous intent to perform, including that:

> a.    tithed funds would be directed towards charitable purposes,
>
> b.    funds donated to specific church organizations would be directed to those organizations and used exclusively for those purposes,
>
> c.    the "vast majority" of donated funds would be used for charitable purposes, and
>
> d.    COP followed all applicable laws regarding its use of donated funds.

105.    These statements and promises were false and or made with no contemporaneous intent to perform.

106.    Alongside these statements and promises, COP actively sought to conceal the disposition of donations in concert with Ensign, including concealment of the amount and status of funds held by Ensign.

107.    Defendant COP knew that these statements were false, or recklessly made them without regard for their truth despite substantial evidence to the contrary and furthered its deception by a course of concealment of the disposition of the donations.

108.    Defendant COP made these statements and undertook its concealment for the purpose of inducing Plaintiffs and Class members to donate money to COP.

109.    Defendant Ensign contributed to COP's fraud by accepting donated funds, directing those funds towards noncharitable activities without ever disbursing them towards charitable activities, and concealing the extent of the COP's holdings.

110.    Plaintiffs and Class members reasonably relied on these statements, which they believed to be true, and were unaware of the true disposition of the funds.

111.    As a result of their reasonable reliance, Plaintiffs and Class members were induced to donate money to COP.

112.    Had Plaintiffs and Class members known how COP actually used donated funds, they would have either not donated funds, or donated lesser amounts.

113.    As a result of the above, Plaintiffs and Class members suffered damages of an amount to be proven at trial, and are entitled to seek such other relief as may be ordered by the Court.

### THIRD CAUSE OF ACTION
### Fraudulent Concealment

114.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

115.    COP intended to provide and was in the practice of providing funds it solicited from Plaintiffs and other Class members to Ensign for the purposes of holding such funds and such other uses as alleged above. Defendants knew about this and other similar material information and had a duty to communicate this information to Class members.

116.    Yet, Defendants deliberately concealed from Plaintiffs and other Class members their intention and practices about the donated funds they received.

117.    Specifically, Defendant COP concealed the full extent of its holdings, and also concealed that it was directing funds to Ensign, for the purpose of investing those funds without ever disbursing them towards charitable activities.

118.    Defendant Ensign contributed to COP's fraud by accepting donated funds, directing those funds towards noncharitable activities without ever disbursing them towards charitable activities, and concealing the extent of the COP's holdings.

119.    Defendants had a legal duty to disclose to Plaintiffs and other Class members the disposition of the donated funds received, including because they were in a fiduciary relationship and/or acting in a fiduciary capacity with the Class members.

120.    COP had a further duty to disclose to Plaintiffs and other Class members the disposition of the donated funds it received because it made full and partial representations that were at odds with its intention and practice with donated funds.

121.    Had Plaintiffs and Class members known how COP actually used donated funds, they would have either not donated funds, or donated lesser amounts.

122.    As a result of the above, Plaintiffs and Class members suffered damages of an amount to be proven at trial, and are entitled to seek such other relief as may be ordered by the Court.

**FOURTH CAUSE OF ACTION**
**Unjust Enrichment**

123.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

124.    As described in detail in the factual allegations above, Defendants made material misrepresentations and omissions to Plaintiffs and the Class in the course of soliciting and use of donations.

125.    Specifically, Defendant COP misrepresented the full extent of its holdings, and also concealed that it was directing funds to Ensign, for the purpose of investing those funds without ever disbursing them towards charitable activities.

126.    Defendant Ensign contributed to COP's fraud by accepting donated funds, directing those funds towards noncharitable activities without ever disbursing them towards charitable activities, and concealing the extent of the COP's holdings.

127.    Plaintiffs and the Class donated money to Defendants in reliance on those misrepresentations and omissions.

128.    Those donations constituted a benefit conferred on Defendants by Plaintiffs.

129.    Defendants understood the donations to be benefits.

130.    Defendants accepted and retained the donated funds, despite their knowledge that the statements made to solicit the donations were false and misleading.

36

131.    Under these circumstances, the continued retention of the donated funds by Defendants would be inequitable.

132.    As a result, Defendants are liable in restitution to Plaintiffs and the members of the Class to disgorge and remit to Plaintiff and the Class monies contributed, in an amount to be proved at trial, and subject to the equitable relief that may otherwise be ordered by the Court.

**Request for Relief**

133.    Because Defendants induced Plaintiffs and their fellow Class members to donate money to COP by misrepresenting how donated funds are and would be spent, they breached their duties to Plaintiffs and the Class.  As described in detail above, Plaintiffs, individually and on behalf of the members of the Class, respectfully request that the Court enter judgment in their favor and against Defendants, as follows:

A.    Certification of the proposed Class, including appointment of Plaintiffs' counsel as Class Counsel;

B.    An order temporarily and permanently enjoining Defendants from continuing the unlawful and deceptive practices alleged in this Complaint;

C.    Injunctive, declaratory and other equitable relief, including, but not limited to, a declaration that Defendants' practices are illegal and a breach of their duties to Plaintiffs and the Class; an injunction on these illegal practices; an order requiring regular public accounting by Defendants as to the collection, use and disposition of collected funds and interest and income earned from these funds; and the appointment of a Special Master or an equally authorized panel of neutrals to monitor the collection,

use and disposition of collected funds and income earned from these funds.

      D.     Costs, restitution, damages, and disgorgement in an amount to be determined at trial;

      E.     An order requiring the Defendants to pay both pre- and post-judgment interest on any amounts awarded;

      F.     An award of costs and attorneys' fees; and

      G.     Such other or further relief as may be appropriate.

## Demand for Jury Trial

Plaintiffs hereby demand a jury trial for all claims so triable.

DATED this 31st day of October 2023

MAGLEBY CATAXINOS & GREENWOOD, PC

James E. Magleby
Yevgen Kovalov

SEEGER WEISS LLP
Christopher A. Seeger (*pro hac vice forthcoming*)
Scott A. George (*pro hac vice forthcoming*)
Frazar W. Thomas (*pro hac vice forthcoming*)

KITNER WOODWARD PLLC
Scott A. Kitner (*pro hac vice* forthcoming)
Martin D. Woodward (*pro hac vice* forthcoming)

Attorneys for Plaintiffs and the Class