David J. Jordan (1751)
djordan@foley.com
Wesley F. Harward (15623)
wharward@foley.com
FOLEY & LARDNER LLP
95 S. State Street, Suite 2500
Salt Lake City, UT  84111
Telephone: (801) 401-8900

Randy T. Austin (6171)
raustin@kmclaw.com
Wade L. Woodard (18155)
wwoodard@kmclaw.com
Justin W. Starr (10708)
jstarr@kmclaw.com
KIRTON MCCONKIE PC
36 S. State Street, Suite 1900
Salt Lake City, UT 84111
Telephone:  (801) 328-3600

*Attorneys for The Church of Jesus Christ
of Latter-day Saints, and Ensign Peak
Advisors, Inc.*

# THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| DANIEL CHAPPELL, MASEN CHRISTENSEN, AND JOHN OAKS, individually and on behalf of all others similarly situated,<br><br>     Plaintiffs,<br><br> v.<br><br>THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS AND ENSIGN PEAK ADVISORS, INC.,<br><br>     Defendants. | **THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS' MOTION TO DISMISS PURSUANT TO RULES 12(B)(1), 12(B)6), AND 9(B)**<br><br>Case No. 2:23-cv-794<br><br>The Honorable Ted Stewart<br><br>**ORAL ARGUMENT REQUESTED** |

Defendant, The Church of Jesus Christ of Latter-day Saints (the "Church"), respectfully submits this motion to dismiss Plaintiffs Daniel Chappell, Masen Christensen, and John Oaks' et al. ("Plaintiffs") Proposed Class Action Complaint (the "Complaint") with prejudice.

# TABLE OF CONTENTS

TABLE OF CONTENTS ......................................................................................................... i

TABLE OF AUTHORITIES .................................................................................................. ii

INTRODUCTION ................................................................................................................... 1

SUMMARY OF RELEVANT ALLEGATIONS .................................................................. 4

LEGAL STANDARD ............................................................................................................. 6

ARGUMENT .......................................................................................................................... 6

    I.     PLAINTIFFS' CLAIMS ARE BARRED BY THE FIRST AMENDMENT ......... 6

          A.     The First Amendment Prohibits this Court from Second-Guessing
               Ecclesiastical Leaders' Decisions about Church Funds. ............................ 7

          B.     The First Amendment Prohibits this Court from Adjudicating a
               Dispute Regarding Whether the Church's Management of Funds
               "Further[ed] the Church's Overall Mission." ............................................ 11

    II.    PLAINTIFFS HAVE FAILED TO STATE A CLAIM. .......................................... 12

          A.     Plaintiffs' Breach of Fiduciary Duty Claim Fails. ................................... 13

               1.     The Church did not owe Plaintiffs a fiduciary duty. .............................. 13

               2.     The Utah Charitable Solicitations Act does not create a fiduciary
                     duty (or a private right of action). ........................................................... 14

          B.     Plaintiffs' Fraud-Based Claims Fail. ........................................................ 15

               1.     All donations were made on the understanding that the Church
                     would use funds in its "sole discretion." ................................................. 15

               2.     Plaintiffs' "Fraud and Fraudulent Inducement" claim fails. .................. 16

                3.     Plaintiffs Fail to State a Claim for Fraudulent Concealment. ................ 21

          C.     Plaintiffs' Unjust Enrichment Claim Fails. ............................................. 21

    III.    Plaintiffs' Claims are Barred by the Statute of Limitations. ................................ 22

CONCLUSION ...................................................................................................................... 23

4868-5672-6934.6

# TABLE OF AUTHORITIES

Page(s)

Cases

*Alta Health Strategies, Inc. v. Kennedy* 790 F. Supp. 1085 (D. Utah 1992) ................................. 23

*Amato v. Greenquist*, 679 N.E.2d 446 (Ill. App. 1997).................................................................. 20

*Ambellu v. Re'EseAdbarat Debre Selam Kidist Mariam*, 387 F. Supp. 3d 71 (D.D.C. 2019) .......11

*Ashcroft v. Iqbal* 556 U.S. 662 (2009) ..................................................................................... 6, 17

*Berrett v. Stevens*, 690 P.2d 553 (Utah 1984)................................................................................ 31

*Bible Way Church of Our Lord Jesus Christ of the Apostolic Faith of Washington D.C. v. Beards*,
    680 A.2d 419 (D.C. App. 1996) ................................................................................................ 12

*Bouchard v. New York Archdiocese*, No. 04 Civ. 9978 2006 WL 1375232 (S.D.N.Y. May 18,
    2006)......................................................................................................................................... 19

*Bright v. Sorensen*, 2020 UT 18, 463 P.3d 626 ............................................................................. 30

*Bryan R. v. Watchtower Bible & Tract Soc'y*, 738 A.2d 839 (Me. 1999) ...................................... 19

*Burnett v. Mortgage Electronic Registration Systems, Inc.* 706 F.3d 1231 (10th Cir. 2013).......... 6

*Church of Scientology Flag Service Org., Inc. v. City of Clearwater* 2 F.3d 1514 (11th Cir. 1993)
    ............................................................................................................................................ 2, 13

*Colosimo v. Roman Catholic Bishop of Salt Lake City*, 2007 UT 25, 156 P.3d 806.................... 33

*Crookston v. Fire Ins. Exch.* 817 P.2d 789 (Utah 1991)................................................................ 23

*Daines v. Vincent* 190 P.3d 1269 (Utah 2008) .............................................................................. 24

*Farlow v. Peat, Marwick, Mitchell & Co.*, 956 F.2d 982 (10th Cir.1992) ...................................... 24

*Franco v. Church of Jesus Christ of Latter-day Saints*, 2001 UT 25, 21 P.3d 198 ................. 18, 20

*Gaddy v. Corp. of President of Church of Jesus Christ of Latter-day Saints*, 451 F. Supp. 3d 1227
    (D. Utah 2020)........................................................................................................................... 18

*Gaddy v. Corp. of the President of The Church of Jesus Christ of Latter-day Saints*, No. 19-cv-
    00554, 2023 WL 2665894 (D. Utah Mar. 28, 2023) ........................................................... passim

*Gerwe v. Gerwe* 424 P.3d 1113 (Utah App. 2018) ................................................................. 23, 26

*Harris v. Matthews*, 643 S.E.2d 566 (N.C. 2007) ........................................................... 10

*Hendryx v. People's United Church*, 42 Wash. 336 (1906) ............................................ 14

*Heritage Vill. Church & Missionary Fellowship, Inc. v. State*, 263 S.E.2d 726 (N.C. 1980) ....... 10

*Hosanna-Tabor, Evangelical Lutheran Church & Sch.  v. EEOC*, 565 U.S. 171 (2012) .......... 8, 13

*In re Godwin*, 293 S.W.3d 742 (Tex. App. 2009) ........................................................ 12

*Jensen v. Cannon*, 2020 UT App 124, 473 P.3d 637 .................................................... 30

*Jones v. Wolf* 443 U.S. 595 (1979) ............................................................................ 1

*Kedroff v. St. Nicholas Cathedral* 344 U.S. 94 (1952) ........................................... 2, 8, 13

*Koch v. Koch Indus., Inc.* 203 F.3d 1202 (10th Cir. 2000) .............................................. 7

*Langford v. Roman Catholic Diocese of Brooklyn*, 677 N.Y.S.2d 436 (Sup. Ct. 1998) *aff'd* 705 N.Y.S.2d 661 (App. Div. 2000) ......................................................................... 20

*Lawrence Nat'l Bank v. Edmonds (In re Edmonds)*, 924 F.2d 176 (10th Cir.1991) ................. 7, 24

*Libhart v. Copeland*, 949 S.W.2d 783 (Tex. App. 1997) ............................................... 14

*Morris v. Scribner*, 508 N.E.2d 136 (N.Y. 1987) ....................................................... 29

*NLRB v. Catholic Bishop of Chi.* 440 U.S. 490 (1979) .................................................. 8

*Peterson v. Shanks*, 149 F.3d 1140 (10th Cir. 1998) ................................................... 17

*Petrell v. Shaw*, 902 N.E.2d 401 (Mass. 2009) ........................................................ 19

*Presbyterian Church v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church* 393 U.S. 440 (1969) ........................................................................................... 8, 15, 16

*Russell Packard Dev., Inc. v. Carson*, 2005 UT 14, 108 P.3d 741 ................................... 33

*Ryder v. Hyles*, No. 20-CV-01153, 2021 WL 7285358 (N.D. Ill. July 29, 2021), *aff'd as modified*, 27 F.4th 1253 (7th Cir. 2022) ..................................................................... 32

*Schwartz v. Celestial Seasonings, Inc.*, 124 F.3d 1246 (10th Cir.1997) ............................. 24

*Serbian E. Orthodox Diocese v. Milivojevich* 426 U.S. 696 (1976) ................................ 2, 9

*Siebach v. Brigham Young Univ.*, 2015 UT App 253, 361 P.3d 130 ................................. 22

*Stone v. Salt Lake City*, 356 P.2d 631 (Utah 1960) .................................... 26, 27, 29, 31

*United States v. Rasheed*, 663 F.2d 843 (9th Cir. 1981), *cert denied*, 454 U.S. 1157 (1982) ....... 14

*Utah Gospel Mission v. Salt Lake City Corp.*, 425 F.3d 1249 (10th Cir. 2005) ............................. 4

*Watson v. Jones* 80 U.S. (13 Wall.) 679 (1871) ........................................................................ 2, 9

*Williams v. Kingdom Hall of Jehovah's Witnesses*, 2021 UT 18, 491 P.3d 852 ........................... 18

*Wolter v. Delgatto* 2006 WL 664214, at *2 (Tex. App.—Houston [14th Dist.] Mar. 16, 2006, no
    pet.) 2006 WL 664214, at *2 (Tex. App.—Houston [14th Dist.] Mar. 16, 2006, no pet.) ......... 11

*Yazd v. Woodside Homes Corp.*, 2006 UT 47, 143 P.3d 283 ......................................................... 30

Statutes

26 U.S.C. § 501(c)(3) ............................................................................................................... 19, 20

U.S. Const. amend. I ...................................................................................................................... 6

Utah Code § 13-22-23 .................................................................................................................. 14

Utah Code § 78B-2-305 ............................................................................................................... 22

Rules

Fed. R. Civ. P. 9(b) ...................................................................................................................... 16

Regulations

Treas. Reg. § 1.501(c)(3)-1(d)(2) ................................................................................................ 19

Other Authorities

1 Religious Organizations and the Law § 8:26 ............................................................................ 20

Restatement of the Law, Charitable Nonprofit Organizations § 2.02 .......................................... 14

## INTRODUCTION

As once devout believers, Plaintiffs gave tithes to The Church of Jesus Christ of Latter-day Saints.  Now they want those alms back, claiming they gave under "false pretenses" because they had "no reason to ever suspect" that the Church "would take any portion of their donations" and invest it.  Compl. ¶ 79.  Plaintiffs apparently believed the Church "immediately" used all donations.  Compl. ¶¶ 80, 101.  In reality, Plaintiffs accuse the Church of nothing more than managing its finances in ways with which they disagree.  Fraud claims against churches typically involve pastors fleecing parishioners to fund lavish lifestyles.  Not this case.  Plaintiffs object to the Church *saving*—not misusing—donated funds.  Stripped of pejorative rhetoric—e.g., "large-scale hoarding"—Plaintiffs' complaint accuses the Church of nothing more than prudent money management.

Indeed, even taking everything Plaintiffs say as true, Plaintiffs accuse the Church, at most, of being overly cautious and over prepared for a future of growth and challenges that Plaintiffs believe will never come.  But Plaintiffs' dissatisfaction or disagreement with the Church's fiscal management does not create a legal right to a refund of their gifts or any other damages from the Church.  Nor does it change the fact that Plaintiffs knew when they made tithing donations that the Church would manage these funds in its "sole discretion" to ultimately fulfill its religious purposes.  Compl. ¶ 37.

Plaintiffs invite this Court to second-guess how Church leadership manages Church funds.  The First Amendment prohibits such judicial oversight of internal Church management.  Rather, the First Amendment requires courts to "defer" to the "highest" church authorities.  *Jones v. Wolf*, 443 U.S. 595, 602 (1979).  "'All who unite themselves to [a church] do so with an implied consent to [its] government, and are bound to submit to it.'"  *Serbian E. Orthodox*

1

*Diocese for U.S. of Am. & Canada v. Milivojevich*, 426 U.S. 696, 711 (1976) (quoting *Watson v. Jones*, 80 U.S. 679, 729 (1871)).  A disenchanted church member's complaints about church funds is precisely the kind of "intramural church conflict" the First Amendment takes out of the judicial realm.  *Church of Scientology Flag Service Org., Inc. v. City of Clearwater*, 2 F.3d 1514, 1538 (11th Cir. 1993).  Imposition of civil authority in matters of church policy and administration would unconstitutionally entangle courts in "essentially religious controversies" or cause them to "intervene on behalf of groups espousing particular . . . beliefs" about how the church should operate.  *Serbian Eastern Orthodox*, 426 U.S. at 709.  The First Amendment gives churches "independence" from such "secular control" and "power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine."  *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952).

All money donated to the Church has been or will be used for charitable purposes, especially furthering the Church's religious mission.  The Church has a global mission and reach.  It is charged with Christ's "Great Commission" to teach His gospel to every nation, kindred, tongue, and people.  That divine mission includes constructing *thousands* of chapels and temples throughout the world.  It includes supporting a growing missionary force, the world's largest genealogical program, making quality education available to every Church member, and ever-increasing humanitarian efforts.  And the use of Church funds for these purposes is all governed by the Church's highest leaders.  The First Amendment prohibits judicial interference with their decisions.  This Court can no more dictate the proper allocation of resources between missionary work, humanitarian work, temple construction, *or investing funds for future needs* than it can

2

determine whether the Church's teachings are true or false.  Accordingly, Plaintiffs' claims should be dismissed with prejudice.

Plaintiffs' claims also fail under the Federal Rules of Civil Procedure.  Plaintiffs have not pleaded any false statement.  Nor do Plaintiffs plead *reliance* on any allegedly false statement identified in their complaint.  The "false pretenses" they allege are based on nothing more than their assumptions about how the Church would manage its finances.  Plaintiffs cherry-pick statements about contributions to "Philanthropies," a donation platform created by the Church through which members and non-members alike can make gifts for specified purposes.  But Plaintiffs do not plead that they made any donations to "Philanthropies" for such specific purposes.  Thus, these statements are irrelevant.  In any case, even if, as Plaintiffs plead, the Church invests some portion of donations made for such specific purposes, doing so does not constitute fraud.  Plaintiffs' attempt to apply statements about gifts through Philanthropies to the Church's use of all donated funds, including tithing, is a sleight-of-hand.

Plaintiffs' claims are also time barred.  By Plaintiff's own admission, they had knowledge of the alleged "fraud" in late 2019 and early 2020.

In the end, Plaintiffs' complaint is based on a myopic view of the Church's mission and a misunderstanding of the law.  Saving and investing does not divert funds from the Church's charitable purpose; it helps fulfill that purpose.  Earning a return on invested funds increases the Church's capacity to meet future needs—a future envisioned by the Church's leadership and its doctrine.  There is no worldly standard against which the court can measure the Church's fidelity to that vison. Accordingly, all of Plaintiffs' claims should be dismissed with prejudice.

## SUMMARY OF RELEVANT ALLEGATIONS[1]

The Church teaches members to give tithes as a scriptural principle.[2]  Compl. ¶ 2.  The Church also accepts gifts for designated purposes through a donation platform called "Philanthropies," assuring donors that "one hundred percent of every dollar donated" is used for its intended purpose.  Compl. ¶¶ 40-53.  Plaintiffs gave tithes to the Church but do not (because they cannot) plead that they made any donations through Philanthropies for any designated purposes.

Plaintiffs plead that *all* donations to the Church are made under "false pretenses" because the Church allegedly failed to disclose "that a significant amount [of donations] would be invested instead of being used for charitable purposes …."  Compl. ¶¶ 1, 29.  "[T]he critical material fact," Plaintiffs assert, is "that a significant portion of donated monies are not used for any religious or charitable purpose, but rather are diverted to non-charitable investments."  Compl. ¶ 30.

Plaintiffs also plead that the Church created Ensign Peak, "for the purpose of investing those funds …."  Compl. ¶ 117.  Plaintiffs claim they "never contemplated" that some portion of donations would be invested and assert that investing is "contrary to representations by" the Church.  Compl. ¶ 1.  Plaintiffs, however, point to no statement by the Church saying it would not invest funds to further its ability to fulfill its religious mission.

Plaintiffs allege they donated to the Church because they "did not believe and had no reason to ever suspect that [the Church] would take any portion of their donations and invest it

---

[1] Plaintiffs' Complaint contains references and hyperlinks to various documents.  Although not necessary, the Court can consider these documents in ruling on a motion to dismiss.  *See Utah Gospel Mission v. Salt Lake City Corp.*, 425 F.3d 1249, 1253–54 (10th Cir. 2005).

[2] *See, e.g.,* Malachi 3:10-12 King James Version.

4

into Ensign, where it would sit and accumulate interest in perpetuity …."[3]  Compl. ¶ 79.  Instead

"Plaintiffs reasonably relied on [the Church's] public statements, including that the 'vast

majority' of donated funds are 'used immediately.'"  *Id.* ¶ 80.  Plaintiffs cite a 2019 statement by

the Church's First Presidency[4] that is linked in a footnote to the Complaint.  It reads, in part:

> We take seriously the responsibility to care for the tithes and donations
> received from members.  The vast majority of these funds are used immediately to
> meet the needs of the growing Church including more meetinghouses, temples,
> education, humanitarian work and missionary efforts throughout the world.  Over
> many years, a portion is methodically safeguarded through wise financial
> management and the building of a prudent reserve for the future.  This is a sound
> doctrinal and financial principle taught by the Savior in the Parable of the Talents
> and lived by the Church and its members.  All Church funds exist for no other
> reason than to support the Church's divinely appointed mission.[5]

Plaintiffs' complaint relies heavily on a highly-publicized "Letter to An IRS Director"

That letter states that the Church immediately uses the vast majority of donations: "The [Church]

is famously tight lipped about what its total tithes and donations are, but one [Ensign Peak]

senior leader suspected in 2019 that they are $6-$7 billion annually with maybe $5-$6 billion in

expenses."[6]

---

[3] It is unclear what timeframe Plaintiffs have in mind when they say, "in perpetuity." Do they
mean until Christ's second coming, through the millennium, or the end of world?  The point is,
Plaintiffs seek to impose some time restriction on the Church's mission and, by doing so,
demonstrate their misguided effort to entangle the Court in ecclesiastical matters.

[4] The Frist Presidency is the Church's highest governing ecclesiastical body.

[5] Complaint ¶ 7 n.2 linking to: https://newsroom.churchofjesuschrist.org/article/first-presidency-
statement-church-finances (emphasis added).

[6] Compl. ¶ 14 n. 4 linking to Lars Nielsen, "*Letter to an IRS Director*,"
https://www.scribd.com/document/439385879/Letter-to-an0IRS-Director.

**LEGAL STANDARD**

"[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).  Plaintiffs must plead facts to plausibly establish each element of a claim.  *Burnett v. Mortg. Elec. Registration Sys., Inc.*, 706 F.3d 1231, 1236 (10th Cir. 2013).  When alleging fraud, the plaintiff must "set forth the time, place and contents of the false representation, the identity of the party making the false statements and the consequences thereof."  *Koch v. Koch Indus., Inc.*, 203 F.3d 1202, 1236 (10th Cir. 2000) (quoting *Lawrence Nat'l Bank v. Edmonds (In re Edmonds)*, 924 F.2d 176, 180 (10th Cir.1991).

**ARGUMENT**

**I.    PLAINTIFFS' CLAIMS ARE BARRED BY THE FIRST AMENDMENT**

Plaintiffs' claims are barred by the First Amendment.  The First Amendment provides that "Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof."  U.S. Const. amend. I.  For nearly 150 years, the United States Supreme Court has recognized church autonomy as a foundational principle of American law.[7]  Under the First Amendment, "'whenever the questions of discipline, or of faith, or ecclesiastical rule, custom, or law have been decided by the highest of these church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them . . . .'"  ).

The First Amendment "radiates . . . a spirit of freedom for religious organizations, an independence from secular control or manipulation—in short, power to decide for themselves,

---

[7] Useful doctrinal and historical background regarding the church autonomy doctrine and its application in tort cases can be found in Victor E. Schwartz & Christopher E. Appel, *The Church Autonomy Doctrine: Where Tort Law Should Step Aside*, 80 Univ. Cincinnati L. Rev. 431 (2011).

free from state interference, matters of church government as well as those of faith and doctrine." *Hosanna-Tabor*, 565 U.S. at 186 (alteration in original) (quoting *Kedroff*, 344 U.S. at 116). Civil courts cannot "engage in the forbidden process of interpreting and weighing church doctrine." *Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 451 (1969). Such a process, the United States Supreme Court has held, "can play *no role in any . . . judicial proceedings*" because it unconstitutionally "inject[s] the civil courts into substantive ecclesiastical matters." *Id.* at 450-51 (emphasis added); *see also NLRB v. Catholic Bishop of Chi.*, 440 U.S. 490, 502 (1979) ("It is not only the conclusions that may be reached by the [government] which may impinge on rights guaranteed by the Religion Clauses, but also the very process of inquiry leading to findings and conclusions.").

Nor is the principle of church autonomy narrowly limited to questions of religious doctrine. It "applies with equal force to church disputes over church polity and church administration," including the use of church finances. *Serbian E. Orthodox Diocese*, 426 U.S. at 710. Under the First Amendment, "civil courts exercise *no jurisdiction*" over "a matter which concerns theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required of them . . . ." *Id.* at 713-14 (emphasis added) (quoting *Watson*, 80 U.S. at 733-34).

A.     **The First Amendment Prohibits this Court from Second-Guessing Ecclesiastical Leaders' Decisions about Church Funds.**

The First Amendment does not allow courts to adjudicate disputes over the "proper" use of Church funds. "[W]hen a party challenges church actions involving religious doctrine and practice," including how a church uses its funds, "court intervention is constitutionally forbidden." *Harris v. Matthews*, 643 S.E.2d 566, 572 (N.C. 2007). "Because a church's religious doctrine and practice affect its understanding of" how funds should be used, "seeking a

7

court's review of [church governance] matters … is no different than asking a court to determine whether a particular church's grounds for membership are spiritually or doctrinally correct or whether a church's charitable pursuits accord with the congregation's beliefs." *Id.* at 571.  This "is precisely the type of ecclesiastical inquiry courts are forbidden to make." *Id.*; *see also Heritage Vill. Church & Missionary Fellowship, Inc. v. State*, 263 S.E.2d 726, 735-36 (N.C. 1980) (explaining that a court may not adjudicate whether a church spends "an unreasonable percentage" of its funds for other than "a charitable purpose" because "the propriety of a religious organizations' expenditures can be evaluated only by reference to the religious organization's own doctrinal goals and procedures").

In *Wolter v. Delgatto*, the court dismissed a complaint about a church allegedly misapplying funds to a development project because questions about "how and when [the church] may spend its resources" are "ecclesiastical in nature."  No. 14-05-00055-CV, 2006 WL 664214, at *2 (Tex. App.—Houston [14th Dist.] Mar. 16, 2006, no pet.).  Similarly, in *Ambellu v. Re'Ese Adbarat Debre Selam Kidist Mariam*, a church faction alleged that church leaders "engaged in conversion of [] contributions by depriving the Parishioners of their right to vote on how the monies are used."  387 F. Supp. 3d 71, 80 (D.D.C. 2019).  The court dismissed the case because the First Amendment requires that courts strictly avoid "interference with the Church's ability to make governance and spending decisions."  *Id.*  "How a church spends worshippers' contributions is . . . central to the exercise of religion."  *Id.*  Finally, when the plaintiff in *In re Godwin* alleged that church leaders "were poor stewards of church funds and failed to use the church's resources for 'good church purposes,'" the court reasoned that evaluating the propriety of a church's financial expenditures would "require an inquiry into whether the expenditures were justified in light of [the church's] religious doctrine and practices."  293 S.W.3d 742, 750

8

(Tex. App. 2009).  Such an exercise is "the type of ecclesiastical inquiry courts are forbidden to make . . . ." *Id.*  Plaintiffs' assertion that the Church is investing too much, or for too long, would require the Court to interfere with the Church's internal governance and replace the Church's prophetically set priorities with the Court's or Plaintiffs' preferences.  The First Amendment prohibits this.

Courts likewise cannot dictate what disclosures churches owe their members.  "[A] church's financial regime, including any required reports to members, necessarily reflects an array of decisions about a member's obligation to pledge funds, and about the leaders' corresponding responsibility to account for those funds, that a civil court cannot arbitrate without entangling itself in doctrinal interpretations[.]" *Bible Way Church of Our Lord Jesus Christ of the Apostolic Faith of Washington D.C. v. Beards,* 680 A.2d 419, 429 (D.C. App. 1996).  The First Amendment prohibits courts from becoming "arbiters of the appropriate level of disclosure to the church's members in … matters of ecclesiastical fiscal administration …." *Church of Scientology,* 2 F.3d at 1536.

The Complaint's allegations demonstrate the magnitude of the First Amendment problems Plaintiffs invite.[8]  As described in the Complaint, the Church operates a world-wide missionary program.  Compl. ¶ 45.  It operates philanthropic and humanitarian organizations. Compl. ¶ 41.  The Church operates various universities, including Brigham Young University. Compl. ¶¶ 41, 53.  It operates printing services, temples, choirs, farms, food production facilities,

---

[8] The relief requested by Plaintiffs only further highlight the First Amendment problems with their theories.  They request, for example, that a "special master" be appointed to "monitor the collection, use and disposition of collected funds and income earned from these funds."  Compl. ¶ 133 at C.  This is the exact opposite of the First Amendment's guarantee that churches have "power to decide for themselves, *free from state interference*, matters of church government as well as those of faith and doctrine.'" *Hosanna-Tabor*, 565 U.S. at 186  (emphasis added) (quoting *Kedroff*, 344 U.S. at 116)).  It is constitutionally forbidden.

education funds, seminary and institute programs, and much more.  Compl. ¶ 53.  How the Church chooses to allocate resources for these (and many other) purposes, and how they contribute to the Church's overall mission, is not subject to review by the Court.  Simply put, the Court may not second-guess Church leaders on what percentage of funds should be devoted to each objective.  Similarly, the Court cannot determine what amount of funds should be invested for future use by the Church.  Such decisions are constitutionally vested in the Church's ecclesiastical leaders.  Accordingly, Plaintiffs' claims are barred by the First Amendment and must be dismissed.

To be clear, the First Amendment does not allow churches to commit fraud.  A pastor running a Ponzi scheme cannot escape prosecution by cloaking himself in religious garb.  *See United States v. Rasheed*, 663 F.2d 843, 847 (9th Cir. 1981), *cert denied*, 454 U.S. 1157 (1982). Religious leaders cannot "'by chicanery, deceit, and fraud, divert the property of a church organization … for their own selfish benefit ….'"  *Libhart v. Copeland*, 949 S.W.2d 783, 794 (Tex. App. 1997) (quoting *Hendryx v. People's United Church*, 42 Wash. 336 (1906)) (First Amendment did not preclude judicial review of fraud claims against a pastor accused of misappropriating $55,000 in church property to buy a new home for himself).  But Plaintiffs allege nothing like that.  Instead, they allege that the Church is saving and investing too much—i.e., "hoarding" (Compl. ¶ 69)—instead of using donations to "immediately" further its mission (Compl. ¶¶ 80, 101).  Such allegations directly implicate questions of Church doctrine, polity, and administration, which places Plaintiffs' claims squarely in territory the First Amendment makes off limits.

10

**B.     The First Amendment Prohibits this Court from Adjudicating a Dispute Regarding Whether the Church's Management of Funds "Further[ed] the Church's Overall Mission."**

Plaintiffs concede that the donation form used by members to donate tithes and offerings to the Church contains the following language:

> Though reasonable efforts will be made to use donations as designated, all donations become the Church's property *and will be used at the Church's sole discretion to further the Church's overall mission.*

Compl. ¶ 37 (emphasis added).  Each of Plaintiffs' claims asks this Court to second-guess the decisions of the Church's ecclesiastical leaders on the appropriate use of Church funds.  And, given the express disclaimer acknowledged in the Complaint, Plaintiffs' claims turn on whether the Church's management of its funds really did "further the Church's overall mission."  *Id.*  This is exactly the type of inquiry forbidden by the First Amendment.

The United States Supreme Court's decision in *Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Memorial Presbyterian Church* is instructive.  In that case, a dispute arose between two local churches and the general church concerning control of certain properties.  393 U.S. 442.  At that time, "Georgia law implie[d] a trust of local church property for the benefit of the general church on the sole condition that the general church adhere to its tenets of faith and practice existing at the time of affiliation by the local churches."  *Id.* at 443.  Thus, the issue for the jury was whether the "actions of the general church 'amount[ed] to a fundamental or substantial abandonment of the original tenets and doctrines of the (general church).'"  *Id.* at 443-44.

The Supreme Court unanimously held that this "departure-from-doctrine" test violated the First Amendment.  *Id.* at 451.  "[T]he departure-from-doctrine element . . . requires the civil

11

court to determine matters at the very core of a religion—the interpretation of particular church doctrines and the importance of those doctrines to the religion.  Plainly, the First Amendment forbids civil courts from playing such a role." *Id.* at 450.

This Court can no more define the "Church's overall mission" than it can adjudicate any other matter "at the very core of a religion." *Id.* Indeed, there are few more quintessentially *religious* questions than what constitutes a church's "overall mission." To adjudicate any case that turns on the Church's "overall mission," the Court would need to review (and interpret) the Church's scriptures, statements from Church leaders, and other publications from the Church to determine the "orthodox" teachings about tithing and the Church's purpose.  The Court would then need to opine on whether the Church's management of funds did, in fact, "further" that mission in a way that is consistent with the Church's *religious* teachings.  How can a civil court possibly do that?  It can't.

Simply put, the First Amendment prohibits this Court from determining whether the Church's management of funds—and its decisions regarding what percentage of funds to invest for future use— in fact "further the Church's overall mission."  Plaintiffs' claims should therefore be dismissed.

## II.    PLAINTIFFS HAVE FAILED TO STATE A CLAIM.

"[A] complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. at 678 (citation omitted).  "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679.  And a court "will not supply additional facts, nor will [it] construct a legal theory for plaintiff that assumes facts that have not been pleaded." *Peterson v. Shanks*, 149 F.3d 1140, 1143 (10th Cir.

1998) (citation omitted).  Plaintiffs assert four causes of action.  Each fails to state a claim and is addressed in turn.

A.      **Plaintiffs' Breach of Fiduciary Duty Claim Fails.**

Plaintiffs allege that the Church received their donations as "a fiduciary" and owed them "applicable fiduciary duties, including the duty to fully disclose to them all material facts and information in connection with its disposition of the donations."  (Compl. ¶ 96.)

1.      **The Church did not owe Plaintiffs a fiduciary duty.**

No court has recognized a fiduciary relationship between a church and its parishioners and "the Utah Supreme Court has explicitly declined to recognize such a duty."  *Gaddy v. Corp. of President of Church of Jesus Christ of Latter-day Saints*, 451 F. Supp. 3d 1227, 1240 (D. Utah 2020) (hereinafter *Gaddy I*) (citing *Franco v. Church of Jesus Christ of Latter-day Saints*, 2001 UT 25, ¶ 24, 21 P.3d 198, *overturned on other grounds Williams v. Kingdom Hall of Jehovah's Witnesses*, 2021 UT 18, 491 P.3d 852; *see also Gaddy v. Corp. of the President of The Church of Jesus Christ of Latter-day Saints*, No. 19-cv-00554, 2023 WL 2665894 at *21 (D. Utah Mar. 28, 2023) (hereinafter *Gaddy III*) ("Once again, Plaintiffs cite no case law—in any jurisdiction—establishing or even suggesting that a legally cognizable fiduciary duty arises or could arise from ecclesiastical relationship.").  Church membership "do[es] not establish … the type of relationship to the plaintiff from which a fiduciary duty could possibly arise under civil law." *Petrell v. Shaw*, 902 N.E.2d 401, 406 (Mass. 2009); s*ee also Bryan R. v. Watchtower Bible & Tract Soc'y*, 738 A.2d 839, 846 (Me. 1999) ("[Plaintiff] has not provided any support for his assertion that a religious organization has a fiduciary relationship with its members …."); *Bouchard v. New York Archdiocese*, No. 04 Civ. 9978 2006 WL 1375232, at *6 (S.D.N.Y. May 18, 2006) ("general relationship" between church and parishioners "is insufficient in law to support the finding of a fiduciary duty.").

13

Moreover, numerous courts—including the Utah Supreme Court—have held that the First Amendment prohibits imposing a fiduciary duty between churches and parishioners. "Defining such a duty … would embroil the courts" in matters of church doctrine and beliefs "in a diversity of religions professing widely varying beliefs." *Franco*, 2001 UT 25, ¶23, 21 P.3d at 206. "This is as impossible as it is unconstitutional; to do so would foster an excessive government entanglement with religion in violation of the Establishment Clause." *Id*. "[W]hen a parishioner lodges … a claim" for breach of fiduciary duty against his church, "religion is not merely incidental to a plaintiff's relationship with a defendant, it is the foundation for it." *Amato v. Greenquist*, 679 N.E.2d 446, 454 (Ill. App. 1997) (citation omitted). Thus, it would be impossible to define such a duty "without resort to religious facts." *Langford v. Roman Catholic Diocese of Brooklyn*, 677 N.Y.S.2d 436, 439 (Sup. Ct. 1998) *aff'd* 705 N.Y.S.2d 661 (App. Div. 2000). Accordingly, Plaintiffs' breach of fiduciary duty claim fails for lack of a duty.

### 2. The Utah Charitable Solicitations Act does not create a fiduciary duty (or a private right of action).

Plaintiffs cite the Utah Charitable Solicitations Act ("UCSA"), which acknowledges the fiduciary duty owed by an "officer, director, or trustee" *to the charity*. UTAH CODE § 13-22-23. Their duty is to act "in the best interests of the charity in light of its purposes …." RESTATEMENT OF THE LAW, CHARITABLE NONPROFIT ORGANIZATIONS § 2.02. Further undermining the entire premise of Plaintiffs' complaint, this includes a duty to "manage its assets that are held for investments as a prudent investor would in light of the purposes of the charity …." *Id*. § 2.04. The UCSA does not create a fiduciary duty between a charity and donors. And "the UCSA does

14

not create a private cause of action." *Gaddy II*, 2023 WL 2665894, at *22.  Accordingly, the

UCSA does not save Plaintiffs' breach of fiduciary duty claim.[9]

**B.      Plaintiffs' Fraud-Based Claims Fail.**

Plaintiffs purport to assert two fraud-based causes of action: a claim for "Fraud and

Fraudulent Inducement" and one for "Fraudulent Concealment."  Both fail because, as the

Complaint acknowledges, the donations were made subject to an express representation by the

Church that all funds were to be used at the Church's sole discretion.  Both also fail to state a

claim that complies with Rule 12(b)(6) or Rule 9(b).

**1.      All donations were made on the understanding that the Church would
use funds in its "sole discretion."**

Plaintiffs concede that the Church's donation form contains the following language:

> Though reasonable efforts will be made to use donations as
> designated, all donations become the Church's property *and will be
> used at the Church's sole discretion to further the Church's overall
> mission.*

Compl. ¶ 37 (emphasis added).  This disclaimer is clear and unequivocal.  Any member donating

funds to the Church does so with the understanding that the Church's ecclesiastical leaders have

"sole discretion" in how donated funds are used.  This necessarily includes decisions about how

to allocate funds between various competing objectives as well as how much invest for future

use.

At the heart of Plaintiffs' claims are allegations that Plaintiffs disagree with the way the

Church manages its finances.  Plaintiffs take issue with the size of the Church's reserve funds

and investments managed by Ensign Peak.  But the fact that Plaintiffs now apparently regret their

---

[9] Plaintiffs lack standing to challenge the Church's use of donated funds under the UCSA.
"[O]nly the attorney general, and not the donor, has standing to enforce the terms of a completed
charitable gift."  *Siebach v. Brigham Young Univ.*, 2015 UT App 253, ¶ 16, 361 P.3d 130.

donations does not change the fact that the donations were made with the express representation that the Church had "sole discretion" to use the funds.  That is exactly what the Church has done.[10]  The Church has used its "sole discretion" to invest "some portion" of its funds for future use.  Compl. ¶101. There has been no fraud and the fraud-based claims must be dismissed.

### 2.   Plaintiffs' "Fraud and Fraudulent Inducement" claim fails.

Under Utah law, a plaintiff must plead and prove nine elements to establish fraud:

> (1) That a representation was made; (2) concerning a presently existing material fact; (3) which was false; (4) which the representor either (a) knew to be false, or (b) made recklessly, knowing that he [or she] had insufficient knowledge upon which to base such representation; (5) for the purpose of inducing the other party to act upon it; (6) that the other party, acting reasonably and in ignorance of its falsity; (7) did in fact rely upon it; (8) and was thereby induced to act; (9) to his [or her] injury and damage.

*Alta Health Strategies, Inc. v. Kennedy*, 790 F. Supp. 1085, 1093 (D. Utah 1992) (citing *Crookston v. Fire Ins. Exch.*, 817 P.2d 789, 800 (Utah 1991)). These same nine elements apply to fraudulent inducement.  *See Gerwe v. Gerwe*, 2018 UT App 75, ¶ 11, 424 P.3d 1113 (quoting *Daines v. Vincent*, 2008 UT 51, ¶ 38, 190 P.3d 1269).

Federal Rule of Civil Procedure 9(b) requires a party to state the "circumstances constituting fraud or mistake with particularity." Fed. R. Civ. P. 9(b). Specifically, Plaintiffs must set forth the "time, place and contents of the false representation, the identity of the party making the false statement and the consequences thereof." *In re Edmonds*, 924 F.2d 176, 180 (10th Cir.1991). "The purpose of Rule 9(b) is 'to afford defendant fair notice of plaintiff's claims and the factual ground upon which [they] are based....'" *Schwartz v. Celestial Seasonings, Inc.*, 124

---

[10] Tellingly, Plaintiffs' Complaint acknowledges that all funds invested with Ensign Peak are still under the Church's control.  Compl. ¶ 55.  In other words, none of the invested funds have been "lost" to the Church.  The Church can (and does) access and use such funds whenever it wants.

F.3d 1246, 1252 (10th Cir.1997) (alteration in original) (quoting *Farlow v. Peat, Marwick,*

*Mitchell & Co.*, 956 F.2d 982, 987 (10th Cir.1992)).

Plaintiffs' Complaint engages in a sleight-of-hand that fails to satisfy Rule 9(b).  The

Complaint conflates statements about the use of funds donated to Philanthropies with the use of

tithing funds.  In the body of the Complaint, the *only* statements pleaded with particularity about

how the Church will *use* any funds relate to Philanthropies and humanitarian aid.  Compl. ¶¶ 40-

46.  The Complaint repeatedly cites to statements that 100% of donations to LDS Philanthropies

and Humanitarian Aid are used "to help those in need without regard to race, religion, or ethnic

origin."  Compl. ¶¶ 41-56.  Tellingly, the Complaint does not cite a single statement from the

Church about how *tithing* funds would be used other than for its "overall mission" (much less

any representation by the Church that it would not invest any portion of tithing funds, or any

other funds, for future use).

This conflation of tithing donations with donations through Philanthropies is fatal to

Plaintiffs' claim.  Lacking any Church statements regarding tithing, the Complaint repeatedly

references representations regarding Philanthropies.  But Plaintiffs have not alleged they made

any donations through Philanthropies.  Thus, Plaintiffs fail to connect any alleged representations

to their donations.  Without that connection, Plaintiffs cannot—and have not—pleaded that they

reasonably *relied* on the cited representations when making their tithing donations.[11]  Thus,

Plaintiffs fail to plead the essential elements of a fraud claim.  *See Gerwe*, 2018 UT App 75, ¶ 11,

---

[11] Were Plaintiffs to have plead reliance properly, the claim would be further fraught with First
Amendment entanglements.  The Court cannot evaluate what an objectively reasonable church
member or tither would rely upon without wading into considerations "rooted in religious
belief," such as ecclesiastical faith, discipline, or law.  *Gaddy II*, 2023 WL 2665894, at *8.  Such
considerations cannot result in "purely secular decisions" and, accordingly, are barred by the
First Amendment.  *Id.* at *25.

424 P.3d at 1117 (explaining that a plaintiff must plead that he or she acted in reliance upon the allegedly false statement).

This theory further fails because Plaintiffs do not plead the most fundamental element of fraud - falsity.  Plaintiffs have not—and cannot—plead that all donations made through Philanthropies for "humanitarian aid" were not, in fact, used for humanitarian purposes.  Instead, they merely plead that "some portion" of funds donated to the Church were invested.  Compl. ¶ 101.  The fact that "some portion" of some unspecified donations were invested does not plead with particularity that donations through Philanthropies for humanitarian aid were not used for that purpose.

Similarly, Plaintiffs have not identified with particularity any statement about the Church's use of tithing funds that is allegedly false.  Instead, Plaintiffs offer only conclusory allegations—without citation—that tithing funds "would be directed towards charitable purposes."  But the Church has never represented that *all* tithing funds would be *immediately* expended.[12]  Indeed, this very claim was rejected by the Utah Supreme Court.  In *Stone v. Salt Lake City*, 356 P.2d 631 (Utah 1960), a Church member objected to the Church using donations to invest in a downtown Salt Lake City mall, saying "funds collected by the Church must be used for religious and charitable purposes …."  *Id.* at 633.  The Utah Supreme Court explained that investing is not contrary to such purposes, but instead supports them.

---

[12] The Complaint references a 2019 statement from the Church that the "vast majority of these funds are used immediately to meet the needs of the growing Church."  Compl. ¶ 7 n.2.  There is no allegation made with specificity that this statement is untrue.  Ironically, the "Letter to An IRS Director" on which Plaintiffs rely apparently confirms this reality.  It states: "The [Church] is famously tight lipped about what its total tithes and donations are, but one [Ensign Peak] senior leader suspected in 2019 that they are $6-$7 billion annually with maybe $5-$6 billion in expenses."

> [I]t is obvious that all of the funds the Church collects would not be disbursed immediately and directly for such purposes.  It is but common sense and common knowledge that there is need for the exercise of management of such funds for the ultimate accomplishment of the purposes stated.  How this is to be done to best serve those objectives is for those in charge of the management of the Church to decide.  It may well entail the keeping of collected funds in savings accounts, bonds, real estate or any type of investment which, in the judgment of those in charge, best suits that purpose.

*Id*. at 634.

Plaintiffs insinuate that the Church defrauded them by making what they call "noncharitable investments."  (Compl. ¶ 30.)   Plaintiffs apparently labor under the mistaken belief that "charitable" means only helping the poor and needy.[13]  But a "charitable" purpose includes the "advancement of religion."  Treas. Reg. § 1.501(c)(3)-1(d)(2).  Thus, donations spent building and maintaining chapels and temples, funding missionary work, funding education (e.g., BYU-Provo, BYU-Idaho, BYU-Hawaii, Ensign College, and BYU Pathways[14]), including religious education (e.g., Seminaries and Institutes of Religion), is charity.  The vast majority of tithing is used immediately for such purposes.  *See supra* n. 6.  Plaintiffs plead no facts alleging otherwise.[15]

---

[13] The Church's 2022 annual report on caring for those in need shows more than $1 billion in humanitarian expenditures.  Caring for Those in Need, 2022 Annual Report of The Church of Jesus Christ of Latter-day Saints.  In August of 2023, the Church made a $44 million donation to several organizations fighting childhood hunger.

[14] The Church spends more than $1 billion annually funding its educational system.  *See* https://www.deseret.com/faith/2023/5/14/23649253/cbs-60-minutes-mormon-lds-church-finance-story-what-it-missed.

[15] The Church is a 501(c)(3) nonprofit organization, which means: (1) it must be operated exclusively for religious or other charitable purposes; and (2) earnings may not inure to the benefit of any private individual or shareholder.  26 U.S.C. § 501(c)(3).  Plaintiffs plead no facts to show the Church violates these requirements.

It is a misconception that nonprofit organizations cannot invest and earn profits. "Nonprofit does not mean that the organization itself cannot make a profit;" it means "that the profit cannot be distributed to individuals.  The prohibition against private inurement is the essence of the nonprofit test under § 501(c)(3)."  1 RELIGIOUS ORGANIZATIONS AND THE LAW § 8:26 n.4 (2d ed.).

A church, like other charities, has every right to "invest its funds in income-producing property" to make its assets "more productive … to assure the continued validity of [its] spiritual objectives."  *Morris v. Scribner*, 508 N.E.2d 136, 139-40 (N.Y. 1987) (rejecting parishioners' attempt to prevent church from constructing a "high-rise commercial office tower" on the Church's Park Avenue property).  And "if the courts will not interfere with the determination of the board of directors of a business corporation honestly and fairly arrived at, [they] certainly should not do so in the case of a religious corporation … whose temporal affairs [are] often actuated by considerations which cannot be measured in terms of dollars and cents."  *Id.* (first alteration in original) (citation omitted).

In short, Plaintiffs fail to plead with particularity any false statement about donated funds upon which they relied.  Instead, what they plead is merely their own misunderstanding about how the Church manages its funds.  They plead, for example, that they "had no reason to believe that [the Church] would take any portion of their donations and invest it …." Compl. ¶ 79.  But it is "common sense and common knowledge," and perfectly appropriate, for churches to invest for the "ultimate accomplishment" of their religious and charitable mission.  *Stone*, 356 P.2d at 634. Accordingly, even if everything Plaintiffs plead were true, they have not pleaded a plausible fraud claim and their fraud claims should be dismissed.

### 3.      Plaintiffs Fail to State a Claim for Fraudulent Concealment.

It is unclear whether Utah law treats fraudulent concealment as a standalone cause of action. *Bright v. Sorensen*, 2020 UT 18, ¶ 34, 463 P.3d 626. To the extent fraudulent concealment is a distinct claim, Plaintiffs must allege that (1) the Church had a legal duty to communicate information; (2) the Church knew of the information; (3) the Church failed to disclose the information; and (4) the nondisclosure was material. *Gaddy II*, 2023 WL 2665894, at *19, *motion for relief from judgment denied sub nom. Gaddy v. Church of Jesus Christ of Latter-day Saints*, No. 19-CV-00554, 2023 WL 4763981 (D. Utah July 26, 2023) (citing *Jensen v. Cannon*, 2020 UT App 124, ¶ 21, 473 P.3d 637. Whether a duty to disclose exists is "a purely legal question." *Yazd v. Woodside Homes Corp.*, 2006 UT 47, ¶ 14, 143 P.3d 283.

The Church does not have a legal duty to disclose its management or use of donated funds to its members. *See Gaddy II*, 2023 WL 2665894, at *20; *Stone*, 356 P.2d at 633-34. Plaintiffs cannot cite any statute or case that imposes on the Church a duty to disclose its finances to its members. Without a duty to disclose, any lack of disclosure cannot form the basis of a cause of action. Plaintiffs' "fraudulent concealment" claim fails.

### C.      Plaintiffs' Unjust Enrichment Claim Fails.

The elements of a claim for unjust enrichment are: (1) a benefit conferred on one person by another; (2) appreciation or knowledge by the conferee of the benefit; and (3) acceptance or retention of the benefit such that the conferee cannot equitably retain the benefit without payment of its value. *See Berrett v. Stevens*, 690 P.2d 553,557 (Utah 1984). In other words, if someone knowingly accepts a benefit, the person conferring the benefit has a right to expect payment for its value.

Plaintiffs correctly characterize the money they gave to the church over the span of ten years as "donations." Compl. ¶¶ 1, 10, 18, 22-27, 73-79, 96-97, 103-104, 114. A donation is, by

definition, a gift made *without any expectation of receiving something of value in return.* If money is contributed with an expectation of receiving some quid pro quo, it is not a gift. *Ryder v. Hyles*, No. 20-CV-01153, 2021 WL 7285358, at *3 (N.D. Ill. July 29, 2021), *aff'd as modified*, 27 F.4th 1253 (7th Cir. 2022).

Plaintiffs have not (and cannot) plausibly plead that they made their donations to the Church with an expectation of receiving some financial payment in return from the Church. Put simply, gifts cannot form the basis of an unjust enrichment claim and this claim should be dismissed.

## III.    PLAINTIFFS' CLAIMS ARE BARRED BY THE STATUTE OF LIMITATIONS.

Actions for liability created by state statutes must be brought within three (3) years.[16] Utah Code § 78B-2-305. Actions for fraud must also be brought within three (3) years from the time a claimant has actual or constructive knowledge of the facts constituting fraud. *Id.* "[T]he statute of limitations would begin running from the date a plaintiff either discovered or should have discovered his or her claim." *Russell Packard Dev., Inc. v. Carson*, 2005 UT 14, ¶ 23, 108 P.3d 741. A plaintiff is considered to have discovered their cause of action when they have "actual knowledge of the fraud or by reasonable diligence and inquiry should know, the relevant facts of the fraud." *Colosimo v. Roman Catholic Bishop of Salt Lake City*, 2007 UT 25, ¶ 17, 156 P.3d 806 (citation omitted).

The Complaint claims that Plaintiffs made repeated donations to the Church, over the course of ten years, based on alleged representations that the funds received would be used for

---

[16] As discussed in Section II. A., Plaintiffs' claim for breach of fiduciary duty under Utah's Charitable Solicitations Act is foreclosed by Utah law. However, even if the Act were applicable to Plaintiffs' allegations, the claim would have expired for not having been timely filed within three years from the date Plaintiffs should have discovered the alleged breach.

charitable work.  Compl. ¶ 1.  According to Plaintiffs, the December 2019 Letter to An IRS Director revealed that donated funds were funneled "into covert permanent investments." Compl. ¶ 8.  Plaintiffs further state that they relied on the Church's public response to that report, which stated that the Church invests a portion of donations to maintain a prudent reserve for the future.  Compl. ¶¶ 7, 30, 31, 80; fn. 2.  The Court may take judicial notice of the fact that Ensign Peak publicly filed a 13(f) form with the SEC on February 14, 2020, via the publicly accessible EDGAR database, which is required of investors controlling over $100 million in securities. That public filing put Plaintiffs on notice that the Church had substantial invested funds, contrary to their allegations that they were unaware the Church wasn't immediately spending all of the donations it received on charitable work.  As such, as a matter of law Plaintiffs either knew or had no reason to know of the facts on which they now base their claims more than three years before they filed this lawsuit on October 31, 2023.  Accordingly, Plaintiffs' claims for breach of fiduciary duty and fraud are time-barred.

## CONCLUSION

Plaintiffs' allegations reflect nothing more than their misunderstanding of and disagreement with how the Church handles its finances.  Plaintiffs' claims are barred by the First Amendment. Further, the Church owed them no fiduciary duty.  They also fail to state a claim and do not plead fraud with particularity. Finally, Plaintiffs' fraud and breach of fiduciary duty claims are untimely under the applicable statutes of limitation. The Church's Motion should be granted, and the Complaint should be dismissed with prejudice.

DATED: January 9, 2024.

FOLEY & LARDNER LLP

/s/ David J. Jordan
David J. Jordan
Wesley F. Harward

KIRTON MCCONKIE PC
Randy T. Austin
Wade L. Woodward
Justin W. Starr

*Attorneys for The Church of Jesus Christ of*
  *Latter-day Saints and Ensign Peak Advisors, Inc.*

24

## CERTIFICATE OF SERVICE

I hereby certify that on this 9th day of January 2024, that I am employed by the law firm Foley & Lardner, LLP and that I caused a true and correct copy of the foregoing **THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS' MOTION TO DISMISS PURSUANT TO RULES 12(B)(1), 12(B)6), AND 9(B)** to be filed with the Court's electronic filing system, which sent notification and effected service on all counsel of record.

*/s/ Stacy Kamaya*

25